RICHARD BEST
REGIONAL DIRECTOR
Lara Shalov Mehraban
Sandeep Satwalekar
Christopher J. Dunnigan
William T. Conway III
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0061 (Dunnigan)
dunniganc@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>  -against-<br><br>CRAIG A. ZABALA,<br><br>       Defendant,<br><br>  -and-<br><br>DOREEN MCCARTHY,<br><br>       Relief Defendant. | <u>COMPLAINT</u><br><br>20 Civ. 7880<br><br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Craig A. Zabala ("Zabala" or "Defendant") and Relief Defendant Doreen McCarthy ("McCarthy"), alleges as follows:

**SUMMARY**

1. This action involves the fraudulent offering of securities by Zabala, who made material misrepresentations to investors and prospective investors in Concorde Group Holdings

Inc. ("Holdings") and also misappropriated investor proceeds for the benefit of himself and his longtime girlfriend, McCarthy.

2. Between February 2015 and October 2020 (the "Relevant Period"), Zabala raised at least $4.38 million from 17 investors throughout the United States, purportedly to develop Holdings into a merchant bank for mid-sized companies and to invest in affiliate companies. Zabala falsely represented to Holdings' largest investor (and other prospective investors) that Holdings was less than $1 million away from raising $25 million in total, a critical fact to the investor's decision to invest because it evidenced the financial stability of Holdings and the success of its offering. In reality, Holdings never raised more than $5 million. Zabala also stood by when his subordinate employee at Holdings made similar misrepresentations to investors, and failed to correct those misrepresentations.

3. After obtaining investments in Holdings, Zabala promptly misappropriated approximately $3.17 million -- or 72% -- of the investor funds. Specifically, he misused approximately $1.97 million for his and McCarthy's personal use and another approximately $1.2 million to make *Ponzi*-like payments to the investors of Holdings' parent company, Concorde Group, Inc. ("Group"). Holdings never made any meaningful progress towards developing its purported business.

## VIOLATIONS

4. By virtue of the foregoing conduct and as alleged further herein, Zabala violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

5. Unless Zabala is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions,

and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

7. The Commission seeks a final judgment: (a) permanently enjoining Zabala from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Zabala to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon; (c) ordering Zabala to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Zabala from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently prohibiting Zabala from participating in any offering of a penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; (f) ordering McCarthy to pay, with prejudgment interest, all ill-gotten gains by which she was unjustly enriched, under Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; and (g) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

9. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and

3

courses of business alleged herein.

10. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Zabala resides in the Southern District of New York and Holdings' principal place of business is in this District. In addition, from his and McCarthy's residence and Holdings' office in this District, Zabala offered and processed investments in Holdings.

## DEFENDANT[1]

11. **Zabala**, age 68, is a resident of New York, New York. During the Relevant Period, Zabala has been the President, CEO and Chairman of Holdings and its parent company, Group, and affiliates, Concorde Investment Managers, LLC, Concorde Europe, Ltd., Blackhawk Capital Group BDC, Inc., and DBL Holdings, LLC (collectively, with Holdings, Group, and their affiliates, the "Concorde Entities").

## RELIEF DEFENDANT[2]

12. **McCarthy**, age 65, is a resident of New York, New York and is an artist. McCarthy has been in a personal relationship with Zabala since approximately 1999, and they have lived together for nearly the same length of time. Between January 2015 and September 2019, McCarthy received $733,924 in Holdings' investor funds from Zabala.

---

[1] The Commission has entered into two tolling agreements with Zabala that cumulatively toll the statute of limitations for nine months through October 29, 2020.

[2] The Commission has entered into a tolling agreement with McCarthy that tolled the statute of limitations for six months from January 1, 2020 through June 30, 2020.

**OTHER RELEVANT INDIVIDUALS AND ENTITIES**

13.     **Group**, formed in 1995, is an inactive Delaware corporation based in New York, New York.  Group is the parent company for the Concorde Entities and Zabala owns a majority of its outstanding common stock.  Between 2002 and 2014, Group raised approximately $18 million through various unregistered offerings of equity, options and debt.  Group's transfer agent records indicate that it has 241 active shareholders.

14.     **Holdings**, formed in January 2015, is a Delaware corporation with its principal place of business in New York, New York.  Zabala is Holdings' President, CEO and Chairman as well as a majority owner of its outstanding common stock.  Between February 2015 and August 2019, Holdings raised $4.38 million in investor funds.  Holdings has been inactive and insolvent since at least September 2019.

**FACTS**

**I.      THE HOLDINGS OFFERING**

15.     According to its offering materials, Holdings would obtain equity and debt positions in the Concorde Entities in exchange for investing in them.  The Concorde Entities in turn purportedly provided financial services to entrepreneurs, investors and businesses within the "Middle Market" -- defined in Holdings' offering materials as small to mid-sized companies with revenue and market capitalization of less than $1 billion.  None of the Concorde Entities appear to have ever succeeded in generating revenue.

16.     Between 2000 and 2014, Zabala, who is the CEO and Chairman of all of the Concorde Entities, raised over $20 million in investor funds for the Concorde Entities other than Holdings, with the vast majority of this amount raised on behalf of Group.

17.     In February 2015, Holdings launched a $12 million private offering of senior notes that were to pay 8% interest on a semi-annual basis over 5 years along with warrants that provided

5

the option to purchase common stock at $.50 per share.  In August 2015, Holdings increased the offering amount to $25 million, and then in January 2016 increased the interest rate on the senior notes to 13%.  Almost immediately, Holdings fell behind in interest payment obligations and, as a result, had certain noteholders agree to have their owed interest payments converted into shares of Holdings common stock.  In January 2019, Holdings discontinued its senior notes offering and initiated an $18 million offering of common stock.

18.     Zabala utilized at least ten different versions of the same private placement memorandum (the "PPMs") for the Holdings offering.  Each PPM represented to investors that their money would be used primarily for investment in the Concorde Entities and broker-dealers, working capital, and sales commissions.  Additionally, the PPMs stated that Zabala would receive a salary upon closing of the offering.  Holdings' earlier PPMs, which were distributed to some prospective investors, represented that Group had approximately $7.866 million in receivables that it "expects to collect in 2015 [or 2016]" and that it has "approximately $83.4 million of transactions in its 'deal pipeline,' which may generate revenue of approximately $8 million in 2015 [or 2016]."  Later PPMs, which Zabala distributed to the vast majority of investors, do not contain this description, and Group's bank accounts do not reflect collection of these receivables or revenues in 2015 or 2016 or at any point thereafter.

19.     Zabala controlled the content of the Holdings' PPMs and other documents, such as marketing materials and investor communications, relating to the offerings.  Zabala also emailed one of Holdings' Managing Directors who was responsible for soliciting investors, referred to herein as "Managing Director A," various marketing materials, such as PowerPoints, balance sheets and investment illustrations, to distribute to prospective investors.  Managing Director A sent Zabala "proposed" emails to potential investors for his review and approval, which Zabala would sometimes revise, and typically copied Zabala on his actual emails to potential investors.

20. Holdings' sales efforts were primarily initiated by Managing Director A, who solicited friends and former colleagues, until his death in August 2017. Following Managing Director A's death, Zabala encouraged existing investors to solicit prospective investors. Regardless of who was responsible for the initial solicitation, Zabala typically forwarded Holdings' offering materials to the prospective investors and communicated with them via email.

21. Between February 2015 and August 2019, Holdings raised at least $4.38 million from 17 individual investors through its offerings of senior notes and, to a much lesser extent, common stock. Zabala, who at all times controlled and had sole signatory power over Holdings' bank accounts, transferred approximately $3.8 million of these investor funds from Holdings' bank account to Group's account and, as discussed below, used the majority of these funds for his and McCarthy's benefit and to repay prior investors in Group. As a result of Zabala's spending, Holdings never came close to having the funds necessary to further its purported business plan and is currently without any assets or operations.

## II. MISREPRESENATIONS AND OMISSIONS TO INVESTORS AND OTHER DECEPTIVE CONDUCT

### A. Misrepresentations About the Amount of Funds Raised

22. Zabala misled Holdings' largest investor, referred to herein as "Investor A," and other prospective investors about the amount of funds that Holdings raised through its offerings. As outlined below, Zabala sent numerous emails to prospective investors falsely stating that Holdings had raised nearly $25 million. In fact, Holdings raised $4.38 million in total and never had more than approximately $1.6 million in its bank accounts. While most of these prospective investors did not invest in Holdings, Zabala also made this misrepresentation to Investor A, who invested approximately $2.9 million in Holdings.

23. In an October 29, 2016 email to Investor A, Zabala stated that Holdings is "looking to secure an $850,000 tranche in order to complete our Offering" while at the same time attaching

7

numerous documents that indicated the size of the offering was $25 million. One of the attachments to Zabala's email to Investor A also contained a false representation that "[Holdings] has already raised $24.2 million in its offering." At that point Holdings had raised only approximately $1.32 million. In addition, the October 29, 2016 email to Investor A attached a PowerPoint document containing Holdings' October 31, 2016 pro forma balance sheet that grossly overstated Holdings' net assets. The balance sheet represented that as of October 31, 2016, Holdings' current assets included $8.3 million in cash while the actual cash balance was only $59,001 and $15.1 million in investments while Holdings held no investments. After this email exchange, Investor A invested $2.9 million in Holdings, which represented more than 60% of the total amount raised by Holdings.

24. Zabala made similar misrepresentations to other prospective investors who did not invest. Notably, in an October 27, 2016 email, Zabala broke off conversations with a prospective investor after he was asked to provide evidence in support of his claim that Holdings had raised $24 million.

25. Zabala was also copied on emails from Managing Director A to prospective investors that contained similar misrepresentations. One example includes a November 21, 2015 email from Managing Director A to a prospective investor, who stated that he changed his mind and decided to invest $100,000 in Holdings based, in part, on Managing Director A's representation that the company had already secured a "large investor" who would be investing around $12 million.

    **B.    Zabala's Misappropriation of Investor Funds**

26. Holdings' PPMs stated that the company would use investor funds for legitimate business purposes, specifically investments in the various Concorde Entities. However, Zabala misappropriated approximately $3.17 million -- or 72% -- of Holdings' approximately $4.38 million in investor funds for his and McCarthy's personal use and to repay older investors in Group.

8

Zabala's misappropriation was carried out in five ways: bank transfers to McCarthy; bank transfers to pay off his personal American Express credit card; personal withdrawals; purported salary payments to himself that he was not entitled to receive before the closing of the Holdings' offering; and *Ponzi*-like redemption payments to prior investors in Group.

27. Zabala attempted to conceal much of his misappropriation of Holdings' investor funds by first transferring investor proceeds from Holdings' bank accounts to Group's bank accounts in the guise of an investment or loan and then to himself and McCarthy. Holdings' PPMs dated January 2017 onwards falsely represented that Holdings would provide an unsecured loan to Group in return for 15% in annual interest payments. However, from 2015 to 2019, Zabala transferred approximately $3.8 million in Holdings' investor funds to Group -- most of which was subsequently diverted to himself and McCarthy -- but Holdings never received any interest in return for this purported loan.

        i.    **Payments to McCarthy**

28. Between January 2015 and September 2019, Zabala transferred $734,184 in Holdings' investor funds to McCarthy's bank account, often via Group's bank account. Zabala transferred these funds through 186 separate checks from Group's bank account that he signed and gave to McCarthy, with the amounts ranging from $31 to $100,000.

29. In several instances, Zabala transferred money to McCarthy directly from Holdings' bank account shortly after incoming investor proceeds. For example, on November 2, 2015, Zabala deposited a $300,000 investor check and then later that same day wrote McCarthy four checks totaling $108,700, as well as a check to himself for $9,000 and another $300 in ATM withdrawals.

30. McCarthy, who is an artist and lives with Zabala, has never had an employment contract with Holdings or any of the Concorde Entities and was not involved in the solicitation of investors for Holdings. In addition, McCarthy did not receive any payments through Holdings'

9

payroll provider unlike Zabala and two other Holdings employees.  Moreover, during Zabala's July 2020 testimony before the Financial Industry Regulatory Authority ("FINRA"), Zabala was specifically asked to identify Group and Holdings employees and never mentioned McCarthy.

### ii.     Payment to Cover Zabala's Amex Debt

31.     During the Relevant Period, Zabala used $597,740 of Holdings' investor funds to pay most of the $629,374 in charges on his personal American Express ("Amex") credit card that he incurred over the same time period.  Many of Zabala's Amex charges were for obvious personal expenses relating to: artwork ($3,876); clothing ($10,213); fitness ($14,566); wine and liquor ($21,869); medical ($9,986); music and audio ($7,155); optician ($5,513); shoes ($1,156); suitcases ($4,799); upholstery ($7,542); and automobiles ($7,569).  Zabala also used his Amex card to purchase $337,385 in plane tickets for himself and McCarthy to various destinations throughout the world such as India, London, Germany, France, Canada as well as various U.S. cities.

### iii.    Zabala's Personal Withdrawals

32.     From January 2015 through October 2019, Zabala withdrew a net total of $130,356 of Holdings' investor funds through 471 ATM withdrawals -- typically ranging from $100 to $500 -- as well as through four checks to himself and one teller withdrawal.

### iv.    Zabala's Purported Salary Payments to Himself

33.     Through the entire time period of Holdings' offering, Zabala gave himself a total of $510,000 in salary in the form of monthly payments ranging from $1,000 to $17,000.  These salary payments were funded entirely through Holdings' investor funds and were contrary to Holdings' PPMs, which stated that Zabala would not be entitled to a salary until "at the time of the closing of the Offering."

        v.        ***Ponzi*-Like Payments to Earlier Group Investors**

34. Between February 16, 2016 and April 25, 2019, Zabala transferred over $1.2 million to 10 investors in Holdings' parent company, Group, as apparent redemption payments for their earlier investments in Group. Zabala relied almost entirely on Holdings' investor funds to make these *Ponzi*-like payments to Group investors. As an example, Investor A made $1 million investments in both November 2017 and January 2018, which were used shortly thereafter to fund 100% of Group's $550,000 repurchase (as part of a settlement agreement) of its shares from a previous investor. While Holdings' PPMs disclosed that the company could use investor funds for either an investment in or loan to Group, investors were not told that their funds would be used to repay earlier Group investors, which provided little to no value to Holdings and its investors.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

35. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-7 and 11-34.

36. Zabala, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

37. Zabala violated Section 17(a) of the Securities Act by, among other things, knowingly, recklessly or negligently making material misrepresentations to Holdings' investors about the amount of money Holdings' raised and misappropriating their investments.

38. By reason of the foregoing, Zabala, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

39. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-7 and 11-34.

40. Zabala, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

41. Zabala violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by, among other things, knowingly, recklessly or negligently making material misrepresentations to Holdings' investors about the amount of money Holdings' raised and misappropriating their investments.

42. By reason of the foregoing, Zabala, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Zabala from violating, directly or indirectly, Securities Act Sections 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Sections 10(b) [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**II.**

Ordering Zabala to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations;

**III.**

Ordering Zabala to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**IV.**

Permanently prohibiting Zabala from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

**V.**

Permanently prohibiting Zabala from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

**VI.**

Ordering McCarthy to pay, with prejudgment interest, all ill-gotten gains by which she was unjustly enriched, under Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)].

**VII.**

Granting any other and further relief this Court may deem just and proper.

Dated:  New York, New York
September 24, 2020

*Richard R. Best*
_____
RICHARD BEST
REGIONAL DIRECTOR
Lara Shalov Mehraban
Sandeep Satwalekar
Christopher J. Dunnigan
William T. Conway III
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0061 (Dunnigan)
dunniganc@sec.gov